# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30835
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

March 26, 2019

Lyle W. Cayce
Clerk

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

Requesting Parties – Appellants,

v.

CLAIMANT ID 100141850,

Objecting Party – Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, ELROD, and DUNCAN, Circuit Judges.

PER CURIAM:

This case presents another appeal arising out of the *Deepwater Horizon* disaster and the resulting BP Deepwater Horizon Economic and Property Damages Settlement (Settlement Agreement). Here, BP contends that Claimant was not entitled to the $65 million award it received pursuant to the Settlement Agreement because it did not suffer a loss that was caused by the oil spill despite submitting a claim form certifying that it did. Because the district court did not abuse its discretion in declining discretionary review, we AFFIRM.

No. 18-30835

I.

Claimant is a manufacturer of electrical transformers and other industrial products.  In November 2012, it filed a Business Economic Loss Claim Form (Claim Form) pursuant to the Settlement Agreement.  The Claim Form explains that Business Economic Loss (BEL) Claims are for businesses "that assert economic loss due to the Spill," and instructs claimants to "submit certain Supporting Documentation to prove [their claims]."  The Claim Form also requires claimants to certify under penalty of perjury that the information provided is "true and accurate" and that the supporting documents are "true, accurate, and complete."  Prior decisions of this court have referred to this certification as the "attestation."  *E.g.*, *In re Deepwater Horizon* (*Deepwater Horizon III*), 744 F.3d 370, 376–77 (5th Cir. 2014).

As a class member located in economic loss Zone D, Claimant also had to satisfy one of the causation tests set out in Exhibit 4B to the Settlement Agreement to recover on its economic loss claim.  The parties do not dispute that Claimant satisfied one of these tests: the V-shaped revenue pattern test.

After reviewing the Claim Form, the Claims Administrator awarded Claimant $65 million.  BP appealed to a three-member Appeal Panel, arguing *inter alia* that "the claim does not comply with the attestation requirement as recognized in" this court's opinion in *Deepwater Horizon III*.  BP also noted the following in its recitation of the facts: (1) due to the economic recession and regulatory changes, Claimant's revenue decreased significantly from 2007 to 2009 and increased in 2010; and (2) in 2009, Claimant entered into an unfavorable take-and-pay contract which required it to purchase more steel than it needed at above-market prices.  While BP did not brief the issue fully before the Appeal Panel due to a stipulation by the parties, its briefs on appeal make clear that it believes these facts prove that Claimant did not suffer any

2

No. 18-30835

post-spill "loss" that was "caused by" the oil spill despite filing a certified Claim Form indicating that it had.

The Appeal Panel unanimously ruled in favor of Claimant. Rejecting BP's attestation argument, the Panel emphasized that "[t]his position has been rejected by every Panel that has considered it and it will be rejected here as well," although the issue was preserved for appeal. It further noted that the information BP provided regarding market factors that affected Claimant's business was not "material to the assessment of this appeal." BP sought discretionary review by the district court,[1] which the district court denied. BP now appeals.

## II.

We review the district court's denial of discretionary review for an abuse of discretion. *Claimant ID 100250022 v. BP Expl. & Prod., Inc.*, 847 F.3d 167, 169 (5th Cir. 2017). The district court abuses its discretion if the underlying Appeal Panel decision not reviewed by the district court "actually contradicted or misapplied the Settlement Agreement, or had the clear potential to contradict or misapply the Settlement Agreement." *Id.* (quoting *Holmes Motors, Inc. v. BP Expl. & Prod., Inc.*, 829 F.3d 313, 315 (5th Cir. 2016)). It is also an abuse of discretion to deny a request for review that "raises a recurring issue on which the Appeal Panels are split if 'the resolution of the question will substantially impact the administration of the Agreement.'" *Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) (quoting *In re Deepwater Horizon*, 632 F. App'x 199, 203–04 (5th Cir. 2015)).

---

[1] BP's request for discretionary review raised two additional issues separate from its attestation argument. However, BP does not mention these issues in its briefs on appeal, so they are forfeited. *Norris v. Causey*, 869 F.3d 360, 373 n.10 (5th Cir. 2017) (failure to adequately brief an issue constitutes forfeiture).

3

No. 18-30835

III.

BP contends that the district court erred in denying discretionary review for two reasons: (1) Claimant did not suffer a post-spill "loss," a "threshold requirement" separate from the Exhibit 4C loss compensation formula; and (2) Claimant's attestation that its loss was "due to the Spill" was not made in good faith. We will address each in turn.

A.

Beginning with BP's arguments regarding post-spill loss, BP believes that financial data submitted by Claimant demonstrates that Claimant did not suffer a loss after the oil spill. Specifically, BP points out that Claimant experienced a "dramatic drop in revenues" between 2007 and 2009, and that from May to December 2010 its "revenues actually *increased* . . . compared to the same months in 2009." Citing evidence it presented to the Appeal Panel, BP offers several market-related explanations for this revenue decline: regulatory changes, the significant impact of the 2008 economic recession on the electrical transformer industry, and an unfavorable take-and-pay contract that Claimant entered into in 2009. BP insists that these facts prove that Claimant did not suffer any lost profits after the spill.

As the Appeal Panel correctly concluded, none of this information is material to the question on appeal. We indicated as much in our *Policy 495 Opinion*, where we rejected BP's argument in favor of using industry-specific calculation methodologies to determine the compensation owed under the Settlement Agreement. *In re Deepwater Horizon* (*Policy 495 Opinion*), 858 F.3d 298, 303 (5th Cir. 2017). There, acknowledging that the accounting methods in some industries may result in higher awards, we held that the Claims Administrator may not reallocate a claimant's revenue to "ensur[e] that damages are awarded to those who have suffered real losses"—to do so would not comport with the plain language of the Settlement Agreement, which gives

4

each claimant the right to choose its Compensation Period. *Id.* at 303–04.
Significantly, we emphasized that a claimant who "did not suffer economic
losses pursuant to tort principles" may still have "suffer[ed] economic losses
pursuant to the Settlement Agreement." *Id.* at 303. Thus, under the *Policy
495 Opinion*, it is the loss compensation formula set out in Exhibit 4C of the
Settlement Agreement—and not BP's definition or the plain meaning of
"loss"—that determines whether a claimant has suffered a post-spill loss.
Because BP's arguments regarding Claimant's lack of loss rely on financial
information and market factors not considered in that loss compensation
formula, BP has not demonstrated that Claimant did not suffer a post-spill
loss. The district court accordingly did not err in denying discretionary review
on this basis.

## B.

BP next contends that Claimant's attestation in its Claim Form that its
loss was "due to the Spill" was implausible and made in bad faith, and that the
district court erred by declining to address this implausibility issue. BP's
argument on this point relies on the same evidence it presented in support of
its "loss" point of error: that any loss Claimant suffered resulted from market
factors such as the recession and an unfavorable contract, not the oil spill. BP
cites our decision in *Deepwater Horizon III* as requiring the Claims
Administrator and district court to investigate "suspicious forms" and "resolve
real examples of implausible claims" that arise during the claims process.

In *Deepwater Horizon III*, we explained that "[c]ausation for BEL claims
is primarily addressed in Exhibit 4B to the Settlement Agreement," which
"provides for the use of proof of loss as a substitute for proof of causation." 744
F.3d at 375. As BP points out, however, we also emphasized that at the claim
submission stage, proof of causation is made by the claimant's "certification on
the document that the claimant was injured by the *Deepwater Horizon*

disaster." *Id.* at 376. Thus, a claimant need not provide evidence that its economic loss was caused by the oil spill, as BP made a "contractual concession" to limit the causation inquiry in processing claims. *Id.* at 376–77.

Relevant here, we then provided an example to illustrate that a claimant may be entitled to an award under the Settlement Agreement even if its economic losses may have resulted in part from an alternative cause: Three accountants were partners in a small firm in a region affected by the spill. Shortly after the spill, one of the partners took medical leave. Although at least some of the resulting decrease in profits may have been due to the partner's leave, the Settlement Agreement permits payment of the firm's claim without regard for this alternative cause. *Id.* at 377. As we explained:

> These are business loss claims. . . . [W]hy one year is less or more profitable than another [is a] question[] often rigorously analyzed by highly-paid consultants, who may still reach mistaken conclusions. There may be multiple causes for a loss. . . . The difficulties of a claimant's providing evidentiary support and the claims administrator's investigating the existence and degree of nexus between the loss and the disaster in the Gulf could be overwhelming.

*Id.* at 377. Thus, to facilitate efficient resolution of claims, the Settlement Agreement substitutes "a formal assertion of the causal nexus" for the in-depth causation analysis required in a typical business economic loss case. *Id.*

BP appears to agree that the above framework controls the resolution of BEL claims under the Settlement Agreement, but it insists that the evidence it presented warrants an investigation into the plausibility of Claimant's causation attestation. Our *Deepwater Horizon III* opinion forecloses any categorical duty on the part of the Claims Administrator "to ensure that implausible claims are adequately scrutinized such that those lacking a causal nexus are rejected." *Id.* at 378; *see also In re Deepwater Horizon* (*Deepwater Horizon IV*), 753 F.3d 509, 513 (5th Cir. 2014) (concluding that the Claims

Administrator does not have an "additional duty . . . to ensure that every claim contains a direct causal nexus to BP's conduct"). And the Claims Administrator's October 2012 policy statement, which BP did not object to, clarifies that the Claims Administrator will not evaluate potential alternative causes for a claimant's losses. *Deepwater Horizon III*, 744 F.3d at 378.

Here, Claimant satisfied the causation formula set out in Exhibit 4B of the Settlement Agreement and formally attested to the fact that its losses were caused by the oil spill. While the evidence BP presents may indicate additional, market-related causes for Claimant's loss, the existence of these alternative causes does not eliminate the possibility that the oil spill contributed to cause Claimant's loss, nor does it preclude Claimant from recovering under the Settlement Agreement. In our view, Claimant's case is akin to the accountant example, where alternative causes may exist, but determining the loss attributable to those alternative causes versus that attributable to the oil spill would require the kind of "rigorous analysis" that the Settlement Agreement was intended to avoid.

To be sure, our *Deepwater Horizon III* opinion acknowledges that "[s]uspicious forms [will] be subject to investigation" and suggests that district courts "resolve real examples of implausible claims." *Id.* at 377–78. But we do not believe this case presents such a claim. This does not foreclose the possibility that in some other case—where, for example, the Claimant's attestation plainly gives rise to suspicion or BP has presented credible evidence of a sole, superseding cause for a claimant's loss—an investigation into the plausibility of the attestation may be warranted. Here, however, because BP has not demonstrated that Claimant's attestation is implausible, the district court did not err in denying discretionary review.

No. 18-30835

IV.

For the reasons described, we AFFIRM the judgment of the district court.